UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

Pamela O'Shaughnessy,              )
                                   ) No. CV-06-0207-MWL
           Plaintiff,              )
                                   ) ORDER GRANTING DEFENDANT'S
v.                                 ) MOTION FOR SUMMARY JUDGMENT
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,[1]             )
                                   )
           Defendant.              )
                                   )
_____)

BEFORE THE COURT are cross-motions for summary judgment,
noted for hearing without oral argument on February 5, 2007. (Ct.
Rec. 10, 12).  Attorney Clifford King B'Hymer represents
Plaintiff; Special Assistant United States Attorney L. Jamala
Edwards represents the Commissioner of Social Security
("Commissioner").  The parties have consented to proceed before a
magistrate judge.  (Ct. Rec. 4).  After reviewing the
administrative record and the briefs filed by the parties, the
Court **GRANTS** Defendant's Motion for Summary Judgment (Ct. Rec. 12)

_____

[1] As of February 12, 2007, Michael J. Astrue succeeded Commissioner Linda
S. McMahon as acting Commissioner of Social Security. Pursuant to FED. R. CIV.
P. 25(d)(1), Commissioner Michael J. Astrue should be substituted as
Defendant, and this lawsuit proceeds without further action by the parties.
42 U.S.C. § 405(g).

and **DENIES** Plaintiff's Motion for Summary Judgment (Ct. Rec. 10).

## JURISDICTION

On February 13, 2006, Administrative Law Judge ("ALJ") R.J. Payne issued a decision finding the plaintiff was not under a disability as defined in the Social Security Act at any time relevant to this matter.  (Administrative Record, "AR," 13-21).

Plaintiff filed an application for Disability Insurance Benefits ("DIB") (AR 55-57) alleging degenerative joint disease in her right knee, back pain, and depression.[2] (AR 69).  The application was denied initially and on reconsideration.

On September 28, 2006, plaintiff appeared for a hearing before ALJ R.J. Payne.  At the hearing testimony was taken from the plaintiff and medical expert George Weilepp, M.D. (AR 236-296).  On February 13, 2006, the ALJ issued a decision finding that plaintiff was not disabled.  (AR 13-21).  The Appeals Council denied a request for review (AR 5-8). Therefore, the ALJ's decision became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g). Plaintiff filed this action for judicial review pursuant to 42 U.S.C. § 405(g) on July 20, 2006.  (Ct. Rec. 1).

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcript, the ALJ's decision, the briefs of both Plaintiff and the Commissioner and will only be summarized here.  Plaintiff was 48 years old on the date of the ALJ's decision.  (AR 14, 261).

---

[2]The ALJ points out that Plaintiff filed a previous DIB application in 2001. The application was denied initially and on reconsideration. Plaintiff requested a hearing but withdrew her request. ALJ Paul L. Gaughen issued an order dismissing the hearing request on July 11, 2003. ALJ Payne did not reopen the prior application. (AR 13).

She has a high school education.  (AR 14, 75).  Plaintiff's past relevant work consists of working as an environmental technician at a paper mill and as a bartender. (AR 14, 70).  She has not performed substantial work since October 4, 2002. (AR 69, 280).

At the administrative hearing held on September 28, 2005, plaintiff testified that she did not live alone but was sharing houses with her boyfriend. (AR 279).  She is 5'9" tall and weighs from 262 to 272 pounds, but weighed 180 pounds before she retired from her job at the paper mill.  (AR 261, 245).  Plaintiff cannot work because her right knee is constantly painful and the pain worsens with activity.  (AR 262, 282).

Plaintiff is able to walk about 2 blocks before she must stop to rest. (AR 262).  She can stand for 30 minutes and sit for an hour. (AR 264, 267).  Plaintiff's daily activities include showering, sometimes cooking meals, washing dishes, watching television and doing laundry.  (AR 289).  Occasionally she and her boyfriend go for a drive. (AR 291).  Plaintiff has a driver's license with no restrictions on it and drives from Clarkston to Spokane three times a year to visit family.  (AR 281).  She has to lie down 40 to 50% of the day due to knee pain; she takes Aleve for her pain. (AR 268-269, 265).

Medical expert George Weilepp, M.D., testified at the administrative hearing held on September 28, 2005. (AR 239-260).  Dr. Weilepp stated that plaintiff sustained an injury to her right knee and eventually underwent repair in June of 2000. (AR 242).  He pointed out that when Dr. Kaltenbaugh opined that Plaintiff could not be functional at her job, she was working part-time. (AR

243).  Dr. Weilepp noted an assessed GAF of 65[3]. (AR 244).  He opined that plaintiff's chronic pain created a mild to moderate impairment, her depression was greatly improved with medication, and her obesity was a moderate problem. (AR 243-244, 250-251, 253).  Dr. Weilepp opined that plaintiff's impairments would not meet or equal any of the listings of impairment, and Plaintiff's counsel stipulated that no listings were met. (AR 245, 295).

Dr. Weilepp opined that plaintiff's exertional limitations included: (1) lifting 20 pounds occasionally and 10 pounds frequently; (2) standing and walking 60 minutes at a time for a total of 3 to 4 hours a day; (3) sitting for 6 out of 8 hours a day; (4) kneeling, crouching, or stooping no more than occasionally; (5) climbing ramps or stairs no more than occasionally, and (6) not driving industrial vehicles. (AR 246-248).  Plaintiff has no limitations of pushing and pulling, no limitations of handling, feeling and fingering, and no visual or communication limitations. (AR 246-247).  Dr. Weilepp opined that Plaintiff can balance frequently and ordinary driving is within her RCF. (AR 247-248).

The ALJ found that the plaintiff could not perform her past relevant work. (AR 19).  At step five, the ALJ found that plaintiff could perform other work that exists in significant numbers in the regional and national economy and is not disabled. (AR 19-20).

---

[3]A Global Assessment of Functioning of 65 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. Diagnostic AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Ed., (DSM-IV), at 32.

## SEQUENTIAL EVALUATION PROCESS

The Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act also provides that a Plaintiff shall be determined to be under a disability only if any impairments are of such severity that a Plaintiff is not only unable to do previous work but cannot, considering Plaintiff's age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Thus, the definition of disability consists of both medical and vocational components. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. Step one determines if the person is engaged in substantial gainful activities. If so, benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If not, the decision maker proceeds to step two, which determines whether Plaintiff has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If Plaintiff does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which

compares Plaintiff's impairment with a number of listed
impairments acknowledged by the Commissioner to be so severe as to
preclude substantial gainful activity.  20 C.F.R. §§
404.1520(a)(4)(ii), 416.920(a)(4)(ii); 20 C.F.R. § 404 Subpt. P
App. 1.  If the impairment meets or equals one of the listed
impairments, Plaintiff is conclusively presumed to be disabled.
If the impairment is not one conclusively presumed to be
disabling, the evaluation proceeds to the fourth step, which
determines whether the impairment prevents Plaintiff from
performing work which was performed in the past.  If a Plaintiff
is able to perform previous work, that Plaintiff is deemed not
disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).
At this step, Plaintiff's residual functional capacity ("RFC")
assessment is considered.  If Plaintiff cannot perform this work,
the fifth and final step in the process determines whether
Plaintiff is able to perform other work in the national economy in
view of Plaintiff's residual functional capacity, age, education
and past work experience.  20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v); *Bowen v. Yuckert*, 482 U.S. 137 (1987).

    The initial burden of proof rests upon Plaintiff to establish
a *prima facie* case of entitlement to disability benefits.
*Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971); *Meanel v.
Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  The initial burden is
met once Plaintiff establishes that a physical or mental
impairment prevents the performance of previous work.  The burden
then shifts, at step five, to the Commissioner to show that (1)
Plaintiff can perform other substantial gainful activity and (2) a
"significant number of jobs exist in the national economy" which

1  Plaintiff can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th

2  Cir. 1984).

3  **STANDARD OF REVIEW**

4  Congress has provided a limited scope of judicial review of a

5  Commissioner's decision.  42 U.S.C. § 405(g).  A Court must uphold

6  the Commissioner's decision, made through an ALJ, when the

7  determination is not based on legal error and is supported by

8  substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th

9  Cir. 1985); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

10  "The [Commissioner's] determination that a plaintiff is not

11  disabled will be upheld if the findings of fact are supported by

12  substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th

13  Cir. 1983) (*citing* 42 U.S.C. § 405(g)).  Substantial evidence is

14  more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112,

15  1119 n. 10 (9th Cir. 1975), but less than a preponderance.

16  *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989);

17  *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d

18  573, 576 (9th Cir. 1988).  Substantial evidence "means such

19  evidence as a reasonable mind might accept as adequate to support

20  a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

21  (citations omitted).  "[S]uch inferences and conclusions as the

22  [Commissioner] may reasonably draw from the evidence" will also be

23  upheld.  *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).  On

24  review, the Court considers the record as a whole, not just the

25  evidence supporting the decision of the Commissioner.  *Weetman v.*

26  *Sullivan,* 877 F.2d 20, 22 (9th Cir. 1989) (*quoting Kornock v.*

27  *Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

28  It is the role of the trier of fact, not this Court, to

resolve conflicts in evidence.  *Richardson,* 402 U.S. at 400.  If
evidence supports more than one rational interpretation, the Court
may not substitute its judgment for that of the Commissioner.
*Tackett*, 180 F.3d at 1097; *Allen v. Heckler*, 749 F.2d 577, 579
(9th Cir. 1984).  Nevertheless, a decision supported by substantial
evidence will still be set aside if the proper legal standards
were not applied in weighing the evidence and making the decision.
*Brawner v. Secretary of Health and Human Services*, 839 F.2d 432,
433 (9th Cir. 1987).  Thus, if there is substantial evidence to
support the administrative findings, or if there is
conflicting evidence that will support a finding of either
disability or nondisability, the finding of the Commissioner is
conclusive.  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir.
1987).

## ALJ'S FINDINGS

The ALJ found at the onset that the plaintiff meets the
nondisability requirements set forth in Section 216(i) of the
Social Security Act and is insured for benefits through the date
of his decision. (AR 14).  The ALJ found at step one that
plaintiff has not engaged in substantial gainful activity during
any time at issue. (AR 15).  At step two, the ALJ found that
plaintiff's hypertension is not severe because it is controlled
with medication.  (AR 16).  At step two the ALJ also found that
plaintiff's depression is not a severe impairment, but she suffers
from degenerative joint disease of the right knee, which  is
severe. (AR 15-16).  At step three the ALJ found that this
impairment does not meet or medically equal one of the Listings
impairments. (AR 15).

1   At step four, the ALJ concluded that plaintiff has the

2  residual functional capacity ("RFC") to perform a wide range of

3  sedentary work. (AR 16).  Plaintiff's RFC does not permit her to

4  perform the exertional requirements of her past relevant work.

5  (AR 19).  The ALJ found that transferable skills are not at issue

6  in this case. (AR 19).  At step five, based on plaintiff's RFC,

7  age, and education, the ALJ used the Medical-Vocational Guidelines

8  and determined that there are a significant number of unskilled

9  sedentary jobs in the national economy which she could perform

10  despite her limitations. (AR 20).  Accordingly, the ALJ determined

11  at step five of the sequential evaluation process that plaintiff

12  was not disabled within the meaning of the Social Security Act.

13  (AR 20).

14                              **ISSUES**

15   Plaintiff contends that the Commissioner erred as a matter of

16  law.  Specifically, she argues that the ALJ erred by failing to

17  properly credit the opinions of plaintiff's treating orthopedic

18  specialist Orie Kaltenbaugh, M.D., and treating physician Donald

19  Greggain, M.D. (Ct. Rec. 10-2, pp. 6-11).

20   This Court must uphold the Commissioner's determination that

21  plaintiff is not disabled if the Commissioner applied the proper

22  legal standards and there is substantial evidence in the record as

23  a whole to support the decision.

24                            **DISCUSSION**

25   Plaintiff contends that the ALJ erred by failing to credit

26  the opinion of orthopedist Orie Kaltenbaugh, M.D. (Ct. Rec. 10-2,

27  pp. 8-9).  The Commissioner responds that the ALJ properly

28  evaluated the medical evidence and properly rejected some of the

limitations assessed by Dr. Kaltenbaugh. (Ct. Rec. 13, p. 7).

The courts distinguish among the opinions of three types of physicians: treating physicians, physicians who examine but do not treat the claimant (examining physicians) and those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater,* 81 F.3d 821, 839 (9th Cir. 1996). A treating physician's opinion is given special weight because of his familiarity with the claimant and his physical condition. *Fair v. Bowen,* 885 F.2d 597, 604-05 (9th Cir. 1989). Thus, more weight is given to a treating physician than an examining physician. *Lester*, 81 F.3d at 830. However, the treating physician's opinion is not "necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Magallanes v. Bowen,* 881 F.2d 7474, 751 (9th Cir. 1989) (citations omitted).

The Ninth Circuit has held that "[t]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 830. Rather, an ALJ's decision to reject the opinion of a treating or examining physician, may be based in part on the testimony of a non-examining medical advisor. *Magallanes*, 881 F.2d at 751-55; *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). The ALJ must also have other evidence to support the decision such as laboratory test results, contrary reports from examining physicians, and testimony from the claimant that was inconsistent with the physician's opinion. *Magallanes*, 881 F.2d at 751-52; *Andrews*, 53 F.3d 1042-43. Moreover, an ALJ may reject the testimony of an examining, but non-treating physician, in

favor of a non-examining, non-treating physician only when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence. *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995).

Plaintiff saw Orie Kaltenbaugh, M.D., on January 11, 2000,[4] after falling at work and injuring her right knee on December 8, 1999. (AR 138). An MRI showed changes consistent with a meniscus tear. (AR 139). On June 6, 2000, Dr. Kaltenbaugh performed arthroscopy with partial medial meniscectomy and debridement of the articular surface of the medial femoral condyle. (AR 120, 139). A week later the sutures were removed. Dr. Kaltenbaugh told Plaintiff "to continue with activities as tolerated" and to follow up in a month. (AR 139). On July 7, 2000, Plaintiff reported that over the past two weeks she developed pain "along the medial border of the knee at the medial arthroscopy portal and slightly inferior to this" and but had no swelling. (AR 139). Dr. Kaltenbaugh noted that Plaintiff's pain seemed related to her activity level. He found some tenderness to palpitation along the anterior medial border of the tibia and the medial portal, and prescribed Vioxx. (AR 139).

Plaintiff followed up on August 29, 2000, reporting persistent pain at the medial border of the knee, and some grinding and popping but no swelling. (AR 139). On exam Dr. Kaltenbaugh noted full extension with 110 degrees of flexion, no significant crepitation with motion, no effusion, and some

---

[4]The record reflects that Dr. Kaltenbaugh saw Plaintiff on October 29, 1996, for followup after a rotator cuff decompression. He authorized Plaintiff to return to work as of January 6, 1997. (AR 138). These records predate Plaintiff's onset date of October 4, 2002.

tenderness to palpitation over the medial femoral condyle with the knee flexed to 90 degrees. (AR 139).  Dr. Kaltenbaugh opined that the pain was likely due to articular surface changes seen during the arthroscopy. (AR 140).  Plaintiff's symptoms were not relieved by physical therapy and anti-inflammatory medication. (AR 140).  Plaintiff asked about another arthroscopy, but Dr. Kaltenbaugh did not believe that this would significantly change her symptoms. (AR 140).  Plaintiff did not feel capable of returning to work.  Dr. Kaltenbaugh changed Plaintiff's prescription to Celebrex and noted, "I would like an IME performed." (AR 140).  About a month later, on September 28, 2000, Plaintiff's symptoms were unchanged; she did not feel that medication significantly changed her symptoms. (AR 140).  Dr. Kaltenbaugh had "no further treatment to offer at this time." (AR 140). He opined that weight loss would improve Plaintiff's knee pain. (AR 140).  Dr. Kaltenbaugh advised Plaintiff to use anti-inflammatory medication as needed.  He doubted that Plaintiff "will be able to return to work that requires repetitive use of stairs and ladders or entails prolonged walking," and he felt that restriction should be permanent. (AR 140).

Plaintiff returned to Dr. Kaltenbaugh six months later, on March 26, 2001, complaining of worsening knee pain. (AR 140). Walking and standing at work were difficult; after a full day's work, at night Plaintiff had significant pain along the medial border of the knee, radiating along the medial tibia and medial distal thigh.  (AR 140).  She described slight swelling, episodes of her knee "giving way," and nearly falling on stairs several times; she was "trying to retire from Potlatch [a paper mill] this

summer." (AR 140).  On exam, Dr. Kaltenbaugh noted tenderness to palpitation along the medial joint line and crepitation.  (AR 140).  An x-ray showed decreased articular space but not bone on bone contact. (AR 140).  Dr. Kaltenbaugh diagnosed degenerative arthritis, prescribed Lodine, and gave Plaintiff Capsaicin cream to use locally.  He requested and obtained approval for Synvics injections. (AR 140).

Plaintiff saw Dr. Kaltenbaugh 3 months later, on June 1, 2001, for continuing knee pain. (AR 141).  She felt unable to continue her work requirements, including climbing stairs daily. (AR 141).  In addition to knee pain, Plaintiff had problems with her back. (AR 141).  Dr. Kaltenbaugh does not treat back problems. (AR 141). He again opined that an IME should be performed to determine if Plaintiff could continue her present work and recommended an IME. (AR 141).  Plaintiff stated that she did not want further treatment for her knee and did not want Synvisc injections. (AR 141).  Dr. Kaltenbaugh suggested that she follow up as needed. (AR 141).

Plaintiff returned 8 months later, on March 1, 2002, for recurring knee pain. (AR 141).  She used Advil intermittently and experienced pain when weight bearing. (AR 141). Plaintiff's pain was worse at night and interfered with sleep. (AR 141).  Dr. Kaltenbaugh again prescribed Lodine.  (AR 141).  A month later Plaintiff returned complaining "of knee pain stating that she does relatively well, but cannot work due to her pain. She advised me that she is attempting to obtain SSI." (AR 141).  Lodine was not improving Plaintiff's symptoms, so Dr. Kaltenbaugh gave her samples of Bextra. (AR 141).

Plaintiff returned 6 months later, on November 26, 2002, with knee pain that had not improved significantly. (AR 141).  Anti-inflammatory medication provided partial relief.  (AR 141).  Plaintiff recently quit all of her work including working part-time bartending and bookkeeping.  Her knee swells with activity and she felt that being off her knee helps "as much as anything." (AR 141).  Dr. Kaltenbaugh opined that Plaintiff should continue "with activity modification and non-steroidal medication. She may also want to consider Synvisc injection." (AR 141).  On the same date, Dr. Kaltenbaugh wrote a letter opining:

> "[Plaintiff] is totally unable to work at this time, and I do not anticipate her condition improving over the foreseeable future.  There are certain measures that might be effective, such as Synvisc injections or possibly a total knee replacement, but these are prohibitive right now due to financial considerations."

(AR 137).

Plaintiff returned more than a year later, on December 15, 2003, for "deep aching" and swelling in her knee aggravated by walking and climbing stairs. (AR 142.)  She had a recurring sensation of her knee giving way and catching, and fell on several occasions. (AR 142).  On exam Dr. Kaltenbaugh observed that Plaintiff walks without a limp, her knee extends fully and will flex to 120 degrees.  (AR 142).  There was a small amount of effusion and some crepitation with motion, observed discomfort with medial joint line impingement as well as distraction, tenderness along the medial joint line, and no instability.  (AR 142).  X-rays showed loss of articular space on weight bearing films and "what appears to be probable bone on bone contact." (AR 142).  Dr. Kaltenbaugh recommended that instead of using Naprosyn intermittently, Plaintiff should increase the dose and take it

twice daily consistently. (AR 142). He again opined that Synvisc injections were an option if Plaintiff could not function; her age and weight did not favor a total knee replacement. (AR 142).

The ALJ observed that Dr. Kaltenbaugh's November of 2002 opinion that Plaintiff was "totally unable" to work is inconsistent with physical exams showing no crepitation, such as the exam performed by Christina Bjornstad, M.D., on December 17, 2001. (AR 17, citing Exhibit B-2F at AR 121-122). Dr. Bjornstad found on exam that Plaintiff's lower extremities have normal muscle bulk; her gait was normal and balance good; with range of motion testing, she detected no creptitation in either knee. (AR 121). Dr. Bjornstad opined that Plaintiff could work if she stood less than 2 hours a day, is able to sit indefinitely, should walk only on flat surfaces, and should not carry more than 5-10 pounds. (AR 122). The ALJ points out that Dr. Kaltenbaugh appears to base his opinion on Plaintiff's subjective reports of pain rather than on physical exam results and diagnostic studies such as those conducted by examining physician Dr. Bjornstad. (AR 17).

When weighing the medical testimony the ALJ considered Plaintiff's credibility, and found her less than completely credible. (AR 18-19). Credibility determinations bear on the evaluation of medical evidence when an ALJ is presented with conflicting medical opinions. *Webb v. Barnhart*, 433 F. 3d 683, 688 (9th Cir. 2005).

The ALJ gave two reasons for finding Plaintiff less than completely credible: (1) her treatment history is inconsistent with the pain and functional limitations she described, in that Dr. Kaltenbaugh's progress notes refer to reported knee pain but

do not refer to objective findings on examination, and (2)
Plaintiff's lack of compliance with treatment recommendations
negatively affects her credibility. (AR 18).  The ALJ observes
that Plaintiff failed to lose weight until August of 2004, despite
medical recommendations to lose weight to alleviate some of her
knee pain. (AR 18).  The ALJ notes that in June of 2001, Plaintiff
told Dr. Kaltenbaugh that she did not want any further treatment
for her knee, including the Synovisc injections he suggested. (AR
18).  The ALJ opined: "It would seem that if the claimant's knee
pain were as severe as she has alleged, then she would want to try
different treatment modalities, including weight loss and
alternative medications in an effort to relieve her symptoms." (AR
18).

     As noted, when presented with conflicting medical opinions,
the ALJ must determine credibility and resolve the conflict.
*Matney v. Sullivan*, 981 F. 2d 1016, 1019 (9th Cir. 1992). It is the
province of the ALJ to make credibility determinations.  *Andrews
v. Shalala*, 53 F. 3d 1035, 1039 (9th Cir. 1995). However, the ALJ's
findings must be supported by specific cogent reasons. *Rashad v.
Sullivan*, 903 F. 2d 1229, 1231 (9th Cir. 1990). Once the claimant
produces medical evidence of an underlying impairment, the ALJ may
not discredit testimony as to the severity of an impairment
because it is unsupported by medical evidence.  *Reddick v. Chater*,
157 F. 3d 715, 722 (9th Cir. 1998). Absent affirmative evidence of
malingering, the ALJ's reasons for rejecting the claimant's
testimony must be "clear and convincing." *Lester v. Chater*, 81 F.
3d 821, 834 (9th Cir. 1995). "General findings are insufficient:
rather the ALJ must identify what testimony is not credible and

what evidence undermines the claimant's complaints." *Lester*, 81 F. 3d at 834; *Dodrill v. Shalala*, 12 F. 3d 915, 918 (9th Cir. 1993). The ALJ may consider at least the following factors when weighing the claimant's credibility: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and her conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Thomas v. Barnhart*, 278 F. 3d 947, 958-959 (9th Cir. 2002), *citing Light v. Soc. Sec. Admin.,* 119 F. 3d 789, 792 (9th Cir. 1997).

The ALJ accepted Dr. Kaltenbaugh's diagnosis that Plaintiff suffers from degenerative joint disease in her right knee. (AR 20). This medical evidence of an underlying impairment satisfies the first part of the *Reddick* test; the ALJ could not discredit testimony as to the severity of the impairment because it is unsupported by medical evidence. There is no affirmative evidence of malingering in this case; accordingly, the ALJ's reasons for rejecting Plaintiff's testimony must be "clear and convincing."

The ALJ found Plaintiff less than completely credible because the degree of impairment she alleged is not supported by the objective medical evidence of record. A lack of supporting objective medical evidence is a factor which may be considered in evaluating an individual's credibility, provided that it is not the sole factor. *Bunnell v. Sullivan*, 347 F. 2d 341, 345 (9th Cir. 1991). In this case it is not the sole factor that the ALJ relied on; he also found that Plaintiff's failure to follow through with treatment recommendations cast doubt on her claims of disabling

pain and limitations.  Noncompliance with medical care or unexplained or inadequately explained reasons for failing to seek medical treatment cast doubt on a claimant's subjective complaints.  20 C.F.R. §§ 404.1530, 426.930; *Fair v. Bowen*, 885 F. 2d 597, 603 (9th Cir. 1989).  In the undersigned's opinion, the ALJ's reasons for finding Plaintiff less than fully credible are clear and convincing.

When evaluating Dr. Kaltenbaugh's opinion, the ALJ considered the medical expert's testimony as well.  Dr. Weilepp pointed out that when Dr. Kaltenbaugh opined that Plaintiff could not function at her job, she was working part-time. (AR 243.)[5]

The ALJ rejected some of the limitations assessed by Dr. Kaltenbaugh because (1) he appeared to base a great deal of his opinion on Plaintiff's discredited subjective complaints; (2) his opinion was inconsistent with the results of objective testing by an examining physician, and (3) his opinion was inconsistent with the opinion of the testifying medical expert. (AR 17-18).  The ALJ gave specific and legitimate reasons for rejecting Dr. Kaltenbaugh's opinion.

Plaintiff similarly alleges that the ALJ failed to properly credit the opinion of Donald Greggain, M.D., her "longtime attending physician." (Ct. Rec. 10-2, pp. 6-8).  The Commissioner responds that the ALJ rejected Dr. Greggain's opinion because his treatment was intermittent, progress notes from his office showed that medication improved Plaintiff's depression, and Dr. Greggain did not refer Plaintiff for mental health treatment.  The

---

[5]The notes of Plaintiff's visit of November 26, 2002, with Dr. Kaltenbaugh indicate that she recently quit all of her work. (AR 141).

Commissioner contends that these are specific and legitimate reasons to reject the opinion. (Ct. Rec. 13, pp. 7-8).

On June 22, 2002, Plaintiff saw Beth Blankenship, PA-C, at Dr. Greggain's office for pain in her right knee. (AR 168). Plaintiff's orthopedist would not prescribe pain medication because it was "a lifetime problem" and Vioxx had not worked. (AR 168). Plaintiff "has to work to make money to live, but [is] not skilled in other jobs" so she "has to do what she can." (AR 168). Ms. Blankenship suggested injections and prescribed naprosyn and darvocet. (AR 168). Dr. Greggain reviewed the PA-C's plan and approved it on June 24, 2002. (AR 168).

On July 30, 2002, Plaintiff's knee was doing better "when laying off it" and after camping, walking and climbing she experienced pain, tenderness and weakness. (AR 168). Ms. Blankenship noted no obvious swelling, laxity or redness; after discussing anxiety and keeping busy, she prescribed ativan. (AR 168).

At plaintiff's annual exam on November 26, 2002 (about 2 months after onset), Plaintiff asked Charlotte Ainge[6], PA-C, for a naprosyn refill, which she used for pain as needed. (AR 168). Plaintiff noticed increased fatigue in the past few months and "is going through changes at work and has felt more depressed lately." (AR 168).[7]

More than 5 months later, on May 8, 2003, plaintiff returned

---

[6]Ms. Ainge is also referred to as Tuck Ainge in the record. *See e.g.*, AR 174.

[7]On this date, November 26, 2002, when Plaintiff reported "going through changes at work" (AR 168), she also saw Dr. Kaltenbaugh and reported she recently quit all of her work. (AR 141).

to Dr. Greggain's office for back pain, urinary frequency, and worsening depression. (AR 169). She had a lot of stress due to bankruptcy, and felt that she needed a little help. (AR 169). Ms. Ainge provided lexapro samples with directions to increase the dose after one week. (AR 170). Three weeks later (May 28, 2003), plaintiff felt her "depression is vastly improved on lexapro and is wanting to continue." (AR 171). On June 23, 2003, lexapro had helped but Plaintiff "feels she is slipping again"; Ms. Ainge doubled the dose from 20 to 40 milligrams. (AR 171). By August 7, 2003, Plaintiff reported managing her moods much better and coping better with stress. (AR 172). On September 8, 2003, Ms. Ainge noted Plaintiff was walking with a friend 3 evenings a week and described some swelling in her feet and ankles. (AR 172). Her depression and anxiety had improved but Plaintiff felt "a little over medicated." (AR 172). Ms. Ainge noted that Plaintiff's mood was euthymic; her affect bright and conversant; she was well-groomed and well-dressed; her thoughts were organized and goal-directed, and her judgment and insight were good. (AR 173). Ms. Ainge reduced the lexapro dose. (AR 173).

More than 2 months later, on November 19, 2003, plaintiff complained of knee pain 1-2 nights a week, especially after walking a lot during the day. (AR 173). Ms. Ainge observed that Plaintiff's mood is euthymic, her affect appropriate, thoughts are organized and goal-directed, and she has good insight and judgment. (AR 173). Plaintiff's lexapro was continued at 20 milligrams. (AR 174). By December 1, 2003, plaintiff was "doing better over all. Has noted she feels like doing more and getting around better on her knee with more regular naprosyn use." (AR

174).  Her affect was bright and her thought content was less somatic. (AR 174).  On December 22, 2003, plaintiff's fatigue and depression had increased; her home is "chaotic" and she may be losing her insurance. (AR 174).

Plaintiff returned to Dr. Greggain's office 4 months later, on April 23, 2004, with lots of low moods and financial stress; "life seems out of control"; and she wondered about increasing her 20 milligram dose of lexapro.  (AR 175).  Ms. Ainge increased the dose back to 40 milligrams. (AR 176).  On May 19, 2004, Plaintiff was sad and lethargic; she thought that lexapro might not be the right medication. (AR 176).  Ms. Ainge told Plaintiff to taper the lexapro and begin wellbutrin. (AR 176).  On May 24, 2004, Plaintiff was encouraged to seek another orthopedic evaluation of her knee. (AR 176).  On May 28, 2004, Plaintiff's mood had improved but she had problems concentrating; Ms. Ainge noted Plaintiff indicated that she made an appointment for counseling for the following week. (AR 177.)  On June 11, 2004, Plaintiff had a rash. She thought it was caused by the wellbutrin and had stopped taking it.  (AR 177).  Although Ms. Ainge suggested starting the wellbutrin again when the rash cleared (AR 177), when Plaintiff returned a month later she was  taking it a couple of times a week and did not feel she could afford therapy. Her mood was dysphoric and affect hopeful. (AR 178).  Ms. Ainge directed Plaintiff to take wellbutrin daily. (AR 178).  When she returned 2 months later, on September 16, 2004, Plaintiff had run out of medication 3 days earlier and "feels like she is falling apart." (AR 180).  Ms. Ainge noted that Plaintiff's  psychological symptoms are chronic depression, "relieved by medication." (AR

180).  Ms. Ainge discussed with plaintiff the effects of abruptly
stopping antidepressant medication, gave her celebrex for knee
pain, and continued the dose of 300 milligrams of wellbutrin. (AR
181-182). Plaintiff returned in 2 months later, on November 3,
2004, and described being out of medication for a couple of days
and feeling "awful." (AR 183).  Ms. Ainge discussed the importance
of maintaining medications for optimum treatment. (AR 184).  On
November 15, 2004, plaintiff's mood was "pleased" and anxious, not
dysphoric. She was directed to continue taking her medications.
(AR 189).  On November 15, 2004, it was also reported that
plaintiff "appeared to be in no acute distress." (AR 188).  On
November 23, 2004, plaintiff's "mood is much improved with the
wellbutrin" but she continued to experience anxiety in the
evening. (AR 191).  Ms. Ainge added a prescription for an anti-
anxiety medication, BuSpar. (AR 192).

     The first record of Dr. Greggain's direct involvement with
plaintiff is January 31, 2005, when he saw her for menopausal
symptoms, depression and chronic knee pain. (AR 193).  Plaintiff
looked after her grandchildren at times but had no hobbies and
felt helpless and hopeless. (AR 193).  Dr. Greggain diagnosed
depression NOS and opined that plaintiff's dosage of wellbutrin
may need to be increased. (AR 194).

     Dr. Greggain next saw plaintiff about 5 months later, on June
14, 2005, for cough and cold symptoms. (AR 217).  He diagnosed
sinusitis and chronic major depression, and replaced wellbutrin
with effexor. (AR 218).  At this visit, Dr. Greggain referenced
problems Plaintiff had with her right knee, but noted that
"patient appeared to be in no acute distress." (AR 218).  On

August 15, 2005, Dr. Greggain completed a Medical Assessment of
Ability to Perform Work-Related Activities (Physical). (AR 219).
He opined that Plaintiff could  lift and carry less than 10
pounds, walk 2 hours a day, assessed no sitting limitations, and
opined that plaintiff's work-related activities are affected by
"significant depression that is worsening with prolonged
disability, refractory to medication." (AR 219-221).

     The ALJ found that Dr. Greggain's opinion, that plaintiff had
significant depression which was resistant to medication, was
inconsistent with Dr. Greggain's progress notes and with those of
his assistant, Charlotte Ainge, PA-C, from May of 2003 through
June of 2005. (AR 16).  The ALJ is correct.  Extensive progress
notes from Dr. Greggain's office, primarily by Ms. Ainge, indicate
that when Plaintiff took prescribed antidepressant medication
consistently, her mood improved; when she stopped or took it
infrequently, her mood worsened.  The ALJ noted that Dr.
Greggain's treatment was intermittent, including a 5 month gap
from January of 2005 to June of 2005. (AR 16).  The ALJ pointed
out that despite assessing "significant" depression, Dr. Greggain
never conducted a mental status exam and did not refer Plaintiff
for mental health treatment. (AR 16).

     The ALJ is responsible for reviewing the evidence and
resolving conflicts or ambiguities in testimony.  *Magallanes v.
Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  If evidence supports
more than one rational interpretation, the court must uphold the
decision of the ALJ.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.
1984).  It is the role of the trier of fact, not this Court, to
resolve conflicts in evidence.  *Richardson,* 402 U.S. at 400.  The

Court thus has a limited role in determining whether the ALJ's decision is supported by substantial evidence and may not substitute its own judgment for that of the ALJ even if it might justifiably have reached a different result upon de novo review. 42 U.S.C. § 405(g).

Contrary to plaintiff's arguments, the ALJ properly considered the opinions of Drs. Kaltenbaugh and Greggain and gave a number of specific and legitimate reasons supported by medical evidence in the record for discounting those opinions. Since the ALJ's finding regarding plaintiff's limitations is consistent with the credible medical evidence of record, the undersigned finds that plaintiff's argument to the contrary is without merit.

The ALJ's determination that plaintiff retains the RFC to perform a wide range of sedentary work is consistent with and is supported by the detailed medical findings and opinions in the record.

## CONCLUSION

Having reviewed the record and the ALJ's conclusions, this Court finds that the ALJ's decision that plaintiff is able to perform a wide range of unskilled sedentary work is supported by substantial evidence and free of legal error. Therefore, Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (**Ct. Rec. 10**) is **DENIED.**

2. Defendant's Motion for Summary Judgment (**Ct. Rec. 12**) is **GRANTED.**

3.    The District Court Executive is directed to enter judgment in favor of Defendant, file this Order, provide a copy to counsel for Plaintiff and Defendant, and **CLOSE** this file.

IT IS SO ORDERED.

**DATED** this 27th day of February, 2007.

                                s/Michael W. Leavitt
                            MICHAEL W. LEAVITT
                     UNITED STATES MAGISTRATE JUDGE